Good morning, Your Honor. May it please the Court. My name is Martin Goyette, representing the people of the State of California, the plaintiff's opponents in this action, brought by the Attorney General against Sempra Energy Tradin. Please keep your voice up, Mr. Goyette. I beg your pardon, Your Honor. The microphones do not amplify. I would like to reserve three minutes for rebuttal. The two broad issues in this case that we ask the Court to resolve are, first, whether the action against Sempra should be remanded to State court, and, second, whether the action is preempted by Federal law or the filed rape doctrine. With respect to remand, the Attorney General's State law action should be remanded to State court. The Federal court does not have subject matter jurisdiction over this action because it does not arise under any Federal law. And because the claims raised in the complaint do not require determination of a substantial question of Federal law. The only law raised in the complaint is State law. The Business and Professions Code, Section 17200, Unfair Businesses Practice. Oh, this is the Well, Please Complaint Rule? I beg your pardon, Your Honor. This is the Well, Please Complaint Rule? Yes, Your Honor. Well, isn't there an exception there for field preemption? Yes. In this case you might as well go to that since your time is running out. All right. Running quickly. Why don't you go to the meat of the coconut? Your Honor, Sempra contends that under the Federal Power Act, Section 825P. It's more than Sempra. This is a court, too. Gives Federal courts jurisdiction over violations of the Federal Power Act rules, regulations, and orders thereunder. This complaint, and Sempra contends that that section applies because what is at issue here is a violation, an alleged violation of the ISO tariff, which it characterizes as a Federal regulation. This complaint, however, does not allege a violation of the ISO tariff. Sempra has repeatedly construed the complaint in the pleadings as alleging, as the State alleging that the tariff was violated. This complaint not only does not mention the tariff, it doesn't rely on the tariff. The violations here are, in essence, the fraud, the promises without intent to perform, and the misrepresentations that were part of the gaming strategy. How do you distinguish Deinergy or Dinergy? Deinergy, Your Honor, the principle distinction is that in Deinergy, the complaint alleged, actually alleged violations of the ISO tariff. It stated that the defendants in that case violated the tariff, and therefore, the State is seeking relief. That is not the basis for this complaint. I see. So the Attorney General learned from his predecessors' mistakes and filed a complaint that this time didn't mention the tariff. But it's the same lawsuit. You keep bringing the same lawsuit, right? Your Honor, it's not the same lawsuit. I mean, different defendants, but it's the same. We had a massive energy crisis, and it's the – I believe there are probably dozens of appeals pending before this Court pertaining to the energy crisis. There's a great deal of litigation. But in this case, this action, this particular theory, is solely under State law. You're not saying that the predicate violation of any Federal statute was the basis of the unfair competition law? Absolutely not. We are asserting the unlawful prong of the unfair competition law based on State of California's commodities law, not under Federal law. So your claims of all those wonderful taglines like get shorty and ricochet tactics are completely separate from any violation of any FERC-approved ISO tariff? Just to be perfectly clear, Your Honor, we are not taking the position that those games did not violate the FERC tariff. This action is agnostic about those issues. It does not state one way or another. To be perfectly clear, I don't want to be disingenuous with the Court. The State of California has contended at FERC that these – in other actions that these practices did violate the ISO tariff. Certainly that would be my opinion outside of the parameters of this case. But they also violated independently State law. Absolutely. And that's the contention here. So therefore, unlike, for example, SPARTA, which is the case Semper principally relies on, in SPARTA the complaint alleged that NASDAQ violated the NASD rules when it delisted the security in question. In this case, we're not alleging that Semper violated the ISO tariff or any other law, rule, regulation under the Federal Power Act. Next, the complaint does not necessarily raise a Federal issue which is actually disputed or substantial. Again, Semper claims that the issue that inevitably arises is were there violations of the Federal tariff. Again, we're not alleging that. We're saying there were misrepresentations to the ISO about the type of power that was going to be provided. All of these gains are completely outside of any allegation of the ISO tariff. How do you make the claim that the Federal Energy Regulation Commission, FERC, has occupied the field as to what constitutes gaming and what does not constitute gaming, and we shouldn't have 50 different State commissions ruling on this? I think the short answer to that, Your Honor, is that this Court has ruled more than once, but particularly in Grays Harbor, that a court, as opposed to the FERC, a court can adjudicate a claim of why of market manipulation. And in Grays Harbor, the Court was addressing precisely this 2000-2001 Western California energy crisis. Well, the Court in the Grays Harbor remand was only for purposes of examining contract formation issues, correct? Well, the issues which, under Grays Harbor, could be decided by a court include specifically widespread market manipulation. So any contention that allegations of market manipulation during this energy crisis can only be addressed by FERC are utterly inconsistent with that holding in Grays Well, the problem is, I mean, you have the Federal scheme over here at certain rates, and if you then let the States then adjudicate, essentially, a rebate on those rates, say, well, you know, you've got the schedule, you got paid so much, and then they order a payback, essentially that interferes or undercuts the Federal rates. I mean, I don't see how you can have both things going on at the same time and still maintain the integrity of the Federal scheme. Your Honor, there's nothing. We are not seeking any refund or change in the rates in this action. Other actions have been brought. You don't want money? We want consequential damages, not Do you want money? We want money, but not a change in the rates. We want money for the cost of California of blackouts. We want money for the cost of California of having to put the State into the power buying business. How is it different than saying you get a rebate on the rates? What is the economic difference between the two? So you have a State court sitting here saying, we're not going to give a rebate, but what we're going to do is make you pay back, pay these certain amounts, and go back to the very people who paid the rates to begin with. How is that any different from a rebate on the rates? We're simply not challenging the rate that was paid. It's a completely separate measure. How is it economically different? It's economically different because we're not, in this case, we're not saying, for example, a certain transaction took place at $400 per megawatt hour, and the price should have been $200 per megawatt hour or $20 per megawatt hour, and we want the difference. We're not claiming that here. You just say, I want $200, period. You don't say per megawatt hour. How is it any different? I mean, what you're doing is you're saying they supplied this energy at a certain rate, approved by the federal government. We want some of that money back. How do you calculate your damages specifically? Under the California law, the penalties could be calculated per violation. And, of course, the issue of what constitutes a violation would be the subject of litigation. But, for example, each false representation, which wouldn't necessarily correlate with the amount of power or the amount of dollars the state. That would be one way of calculating the penalty. But you can see where this could very well undermine the federal schedule, right? You have the federal authorities setting rates over here, and then, you know, 50 state courts go around saying, oh, yeah, but, you know, what's with the back door, you're going to get some of this money back. It's certainly capable of undermining the federal schedule. We believe this action is totally consistent with what the federal government has done. At FERC, all that has occurred is. . . And that's why you went to FERC and won, right? Well, FERC is. . . The FERC proceedings are still underway. The gaming proceedings is subject to a rehearing request. It's been pending for the last four years. So we don't know the ultimate outcome at FERC. But, counsel, in answer to a question asked by Judge Aldersert, if you're seeking consequential damages, is not a factor in seeking consequential damages the difference between what rate should have been paid and what rate was paid? Absolutely not. Good. Explain that. Yes. As one result of the. . . Can you help on that one, sir? Certainly, Your Honor. I'm glad to help. Your Honor, one of the results of the market manipulation, the widespread Western markets market manipulation, as Grace Harbert put it, was a lack of reliability in the grid. Here in California, we had brownouts and we had blackouts. We had damages because of that. Not because of the high price of the power, but because of the lack of power. One of the things that happened was that the State of California, the Department of Water Resources, had to go into the power buying business and spend millions of dollars to put in place a power buying operation to keep the lights on in the State of California. The State of California had never been in the consumer power buying business. The State of California had never operated a utility equivalent to Southern We had to suddenly put in place an operation like that. We had to buy vast quantities of power, and just the overhead of that operation was incredibly expensive and an enormous cost to the rate payers in the State. And are you also claiming consequential damages because you made payments for standby ancillary services, which didn't exist? No. Not in this action. I'm sorry. I thought you did. Okay. We'll hear from the other side now. Good morning. May it please the Court. Daniel Wall for Semper Energy Trading. I'd like to begin with Chief Judge Kuczynski's observation that the Attorney General has learned from his predecessors and has tried to adapt to the previous complaints. Well, perhaps, but not in time. Because what you have just heard, for the most part, is a version of the Attorney General's theory in this case that those of us on the Semper team have never heard before. We saw it previewed in the reply brief in this case. However, this is an appeal from a motion to dismiss, and the complaint governs. And no matter how many times the Attorney General wants to say it, the fact remains that the complaint in this case alleges violations of the tariff. Mr. Wall, your brief, page 2, says, The complaint alleges that while trading in FREC-regulated wholesale market, SET violated, quote, obligations, unquote, and, quote, requirements, unquote, imposed by the ISO tariff, citing excerpts of records 16 and 17. All right? I have excerpts of records 16 and 17, and I cannot find those allegations. Can you point them out to me, would you please? I'd be very happy to, Your Honor, and I think that the most of the ---- Give me just, you know, ER page 16 line what? Very well. This really needs to be done by the different practices. There's specific different practices. Yes, but you cited these ---- I went to where you were citing, and I couldn't find the words obligations nor requirements, nor could I find violations. What I did find was a series of certain ---- of allegations of actions which violated State law. Where does it violate ISO? I don't see that the ISO tariff is even mentioned. Well, the ISO tariff is mentioned repeatedly throughout ER 13, 14, 15, and 16. So give me a break and just tell me at page 16, 17, which you cited in your brief, where are the allegations that SET violated obligations and requirements? Okay. So with respect to FATCOI, which is this false load scheduling concept, the relevant citations are at ER 15 in paragraphs 55 and 56 of the complaint. And essentially with the argument ---- ER 17. ER 17, excuse me. At 55 and 56 of the complaint. And essentially what this goes to ---- Where is the allegation that it violated ISO tariffs? Right at the beginning of 55. within the ISO-controlled area are required to submit balanced schedules to the ISO. That is a requirement that is found in section 2.2.7.2 of the ISO tariff. And the allegation is that they did not submit balanced schedules? No. What the allegation is ---- It's false schedules. Yes. False schedules. On line 7 there. See, the pervasive allegation here, Judge Bea, is that there is a ---- there were certain norms established by the tariffs as to things like ancillary services and balanced loads and all of these things, and that a bunch of smart people figured out that there were imperfections and loopholes and opportunities for manipulation within these rules. And did so by effecting promissory fraud, making a promise to supply without the present intention or even the future intention of supplying. No. It's much more analogous to committing tax fraud by reporting a deduction that you didn't actually earn. The underlying facts of what's happening to the energy and whether you're a generator or a trader, whatever you're doing, are what they are. But it's a classification scheme. It is saying that you're ---- that you should be paid under bucket A when you should have been paid under bucket B, that you were providing a service that would entitle you to a particular payment when you were not, in fact, providing. I thought the allegations of Get Shorty were that they weren't ---- they didn't have the ancillary services and they promised to provide them and they didn't intend to and they never had them.  But they got a payment for having them stand by when they, in fact, didn't have them. Precisely. They got a tariff-based payment. They manipulated a provision in the tariff, which in that instance was section 2.5.22.11 of the tariff, which said that if you were doing ---- if you were providing those ancillary services, you would be entitled to a payment. So they misrepresented the status of their conduct under the tariff. And may I say, Judge Bea, I think what this comes to at a very fundamental level is that the one thing we all know for sure is that this case is about gaming and it's about market manipulation. It's been said a million times. Gaming and market manipulation are terms that have no meaning of their own without reference to that which was gamed and that which was manipulated. And at all turns in this case, what was gamed and what was manipulated is the norms and rules and regulations that were established by the ISO and PX tariffs. Now, it is ---- it just cannot be ignored that the Attorney General actually began this process by characterizing each and every one of the practices at issue in this case as tariff violations. That was the argument that they made to the FERC. Their filing is at Exhibit B of our request for judicial notice. I can give you the pin sites of the particular allegations where they made contentions that these were tariff violations. Subsequently, the FERC, in its gaming order, made specific findings as to whether these practices were tariff violations. With respect to the Fat Boy practice, the FERC found that it was a tariff violation, but that it was justified as it was within its right to do by countervailing circumstances. That's in the gaming order at paragraph 60. With respect to the ricochet or megawatt laundering, FERC condemned the practice as a tariff violation. That was in the gaming order at paragraph 39. With respect to the congestion games, it held that each of the congestion games were tariff violations, violating the market monitoring and information protocol. That's the gaming order at paragraph 26. And with respect to Get Shorty, the FERC again found that that was a violation of the market monitoring and information protocol. That's at the gaming order at paragraph 51. The references that the Attorney General is making in the complaint, in the complaint to Fat Boy as generating, as a scheme to be paid the market clearing price for imbalance energy at paragraph 56. That has no meaning except in relation to the fact that the ISO tariff specifies circumstances under which one is entitled to be paid the market clearing price for imbalance energy, as opposed to some other kind of energy. With respect to ricochet and megawatt laundering, the allegation in the complaint at paragraphs 57 and 59 was that all of this was done for the purpose of avoiding FERC-imposed price caps in the ISO market and to collect so-called out-of-market or OOM payments. Those are creatures of the tariff. And again, I could go on and on. Every single time, it's the exact case. Now, what's the Attorney General's answer to this in the new revisionist version of its case that we've just heard today? Essentially, what they are promising to do is, if you allow them to do it, is to proceed on theories of fraud and unfairness in willful ignorance and indifference to the federal statutory scheme. They promise never to mention it. Well, I'm sorry, but from the perspective of the policies that underlie preemption, I find that to be quite possibly the worst of all worlds. I mean, I can imagine an affirmatively evil world where someone sets out to undermine the federal scheme. But next to that, the idea that you would just promise not to count the context in which all of these practices occurred, when you promised to just find another logic path to condemn them, creates the greatest possibility of conflict with the federal system. And then that takes me back to what really is, at the end of the day, the core of this, which has been the reason why six panels of the Ninth Circuit, the California and the State of California, have found cases just like this to be preempted. And that is because the root principle is that Congress and the Federal Power Act wanted to draw this clean and bright line, the bright line easily ascertained between the federal jurisdiction over wholesale electricity, sales, regulations and practices, and the state's role with respect to retail electricity. In every one of these cases that have been going on for six years now, in this evolutionary process of somebody trying to find some light, somehow, to get through the mandate of the FPA, is an attempt to dull that bright line, to dim it, to obscure it, to make it less easily ascertainable. And this Court, in Deinergy and other cases, has rejected this time and again as simply a device to – How do you respond to his answer when the Chief asked about Deinergy? He said it's not applicable. He said it was not applicable because there were no references in this complaint to the ISO tariffs and there were in Deinergy. That's false. That's simply false. There are numerous references here in these allegations to the effect that these practices had because of obligations and duties and opportunities that are imposed by the tariff. And there has to be, because the case would be wholly artificial if it were otherwise. As this Court has held several times, and particularly in Deinergy, everything that was done by these carriers, by these parties, with respect to things like ancillary services and balanced loads and all of these things, was funded tariff. Was this Court described as artful pleadings? Yes, indeed. And, you know, I think, you know, I've been up maybe six times arguing this case. I think one of the most insightful things was said, was actually in State Court, one of your colleagues, Judge Richard Kramer in San Francisco, who basically said it's not my job as a judge to hold this complaint up to the light and see if there is any possible angle in which I can find a way through the Federal mandate. I should look at its gist. I should look at its essence. And there is no question that the essence of this is an attempt to supplement regulation by FERC by the Attorney General of the State of California. There is no getting around that. And that is why the case is preempted. Thank you. Thank you, Your Honor. All right. We are way out of time. I'll give you a minute for rebuttal if you wish to take it. You want one minute, Your Honor? One minute. Your Honor, SEPRA dismisses this case by conflating it with a number of other cases. This case must be considered on its own. This is a complaint. I didn't hear any conflation. Did you hear what they said? They said, look, you look at the complaint and there are both explicit and implicit references to the tariff. The whole lawsuit makes no sense at all unless you have the background of the tariff. Let me just make two points. This is what he actually said. First of all, with respect to the example they cited in the complaint, that market participants within the ISO control area are required to submit balanced schedules. We are not alleging a violation of that requirement. We are not alleging that SEPRA submitted unbalanced schedules. So why do you have it there? Because what we're saying is that SEPRA falsely represented to the ISO that their schedules were balanced when, in fact, they weren't. And the balanced schedule requirement is a federal requirement, right? It's a tariff requirement. Well, why isn't this if you think they didn't comply with the tariff? You know, they're supposed to file a balanced requirement. They don't, according to you. Why isn't this a FERC matter? Why isn't that something to be taken up under federal law? How can you possibly have a state court, fully independent state court claim, that hinges on a violation of a federal requirement? We're not alleging a violation. The violation of the federal requirement, if any, stated here, would be to submit balanced schedules. We're not alleging that schedules, that they failed to submit balanced schedules. Well, but when you say they fraudulently said they were balanced, it suggests the only way they could be fraudulently claimed to be balanced is if they were, in fact, not balanced. If they were, in fact, balanced, then it couldn't be fraudulent. So by saying they fraudulently submitted these balanced schedules, you are of necessity saying they were not what they purported to be, which is they were not balanced, which means that they violated federal law. But the allegation we're making here is not that we have a remedy because they submitted unbalanced schedules. It's we have a remedy because they lied. Let me make one other point. They lied in that the schedules were not balanced. That they lied about the nature of the schedules, yes. Then you're agreeing with the Chief Judge that you're alleging a violation of the federal schedules. We're alleging the requirement of the federal schedules. We're simply saying that they were lying. And let me just address the point about the iso tariff and Semper's position that all of this falls within FERC's exclusive jurisdiction. Nothing Semper has said addresses Gray's Harbor, which makes clear that a court, as opposed to FERC, can adjudicate issues of market manipulation. That's what this case is about. Thank you, Your Honor. Thank you, Sergeant. Well, next year argument in the last case on the calendar, state order contractors versus FERC in the city of Vernon.
judges: Kozinski, Aldisert, Bea